IN THE UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
DIVISION

# 04-80403
# CIV-RYSKAMP

LOUIS R. CAPECE, JR.,                           CASE NO.:

Plaintiff,                    **MAGISTRATE JUDGE
VITUNAC**

v.

ANTHONY ELGINDY, ELGINDY SITES, ROBERT HANSEN
ELGINDY ACCOMPLICES, JOHN DOES 1through 50, JOHN
DOES, INC.1through 50, DEPOSITORY TRUST AND CLEARING
CORPORATION, a New York corporation, DEPOSITORY
TRUST COMPANY, A New York Limited Purpose Trust
Company, BROKER DOES 1 through 40, BROKER DEALER
DOES 1 through 40, BRADLEY ABELOW, MICHAEL C.
BODSON, JONATHAN E. BEYMAN, FRANK J. BISIGNANO,
STEPHEN P. CASPER, JILL M. CONSIDINE, PAUL F.
COSTELLO, JOHN W. CUMMINGS, DONALD F. DONAHUE,
MARY M. FENOGLIO, GEORGE HRABOVSHY,
RONALD J. KESSLER, CATHERINE KINNEY,
PETER B. MADOFF, EILEEN K. MURRAY, JAMES P.
PALERMO, THOMAS J. PERNA, RONALD PURPORA,
DOUGLAS SHULMAN, ROBERT H. SILVER, DENNIS J.
DIRKS, and THOMPSON M. SWAYNE, KNIGHT SECURITIES LLP,
SCHWAB CAPITAL MARKETS, SPEER, LEEDS AND KELLOG,
M.H. MYERSON, AMERITRADE, MORGAN STANLEY,
GLOBAL SECURITIES (CANADA), E-TRADE, FIERO BROTHERS,
TD-WATERHOUSE, JEFFRIES & CO, BEAR STEARNS,
FLORIDA DISCOUNT BROKERS, PACIFIC SECURITIES (CANADA),
FLEET TRADING, INSTINET CORPORATION, GRUNTAL & CO.,
ARCHIPELAGO LLC, ING BARINGS FURMAN SELZ,
DREYFUS, FIRST BERMUDA, DLJ, DATEK, SHERWOOD SECURITIES,

Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, LOUIS R. CAPECE, JR., by and through his undersigned attorney, hereby files

his Complaint and demand for a jury trial against Defendants and alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, based upon federal questions concerning laws of the United States; in particular, the Securities Exchange Act of 1933, 15 U.S.C. § 77 (the "1933 Act") and the Securities Exchange Act of 1934, 15 U.S.C. § 78 (the "1934 Act"), and further, on the principle of pendent jurisdiction.

2.      Jurisdiction of this cause is founded on Section 1964 of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964 ("RICO"), Florida RICO, §895.02 Fla. Stat. (2003) and state common law.

3.      Jurisdiction is also founded on 18 U.S.C. § 121 as the matter in controversy exceeds the sum of $75,000.00 exclusive of interest and costs, and is between citizens of different states.

4.      Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391 because this is the judicial district in which a substantial part of the events giving rise to the Plaintiff's claim occurred.

5.      Venue is also proper pursuant to 18 U.S.C. § 1965.

## GENERAL ALLEGATIONS

6.      Plaintiff, LOUIS R. CAPECE, JR. ("CAPECE") is a resident of the State of Florida.

7.      Defendant, ANTHONY ELGINDY ("ELGINDY") is a resident of the State of California, and conducted business in the State of Florida.

8.      Defendant, ELGINDY SITES are private internet sites maintained by ELGINDY. Upon information and belief, ELGINDY is directly or indirectly the owner of these sites, and the precise nature and extent of such ownership and locations of these sites will be identified and this Complaint amended accordingly.

2

9.     Upon information and belief, Defendants ELGINDY ACCOMPLICES are employees and/or agents of ELGINDY, whose exact identities are unknown at this time, but will be identified and this Complaint amended accordingly.

10.    ROBERT HANSEN, Melbourne Florida, ran the website for ANTHONY ELGINDY from 1999 through June 2002, AnthonyPacific.com

11.    Defendants, JOHN DOES 1 through 40 are members of the ELGINDY SITES whose exact identities are unknown at this time, but will be identified and this Complaint amended accordingly.

12.    Defendants, BROKER DEALER, INC. DOES 1 through 40 and STOCK BROKER DOES 1through 20, whose exact identities and locations are unknown that this time, are the brokerage firms and brokers who acted for the JOHN DOES 1 through 40.  These Defendants' identities and locations will be identified and this Complaint amended accordingly.

13.    Defendants, JOHN DOES, INC. 1 through 40 are brokerage firms/broker dealer/market maker firms that effected the trades that were placed by the brokers, whose exact identities and locations are unknown at this time, but will be identified and this Complaint amended accordingly.

14.    Plaintiff does not know the true names or capacities of the Defendants sued herein as BROKER DOES 1 through 20, inclusive who are each individuals operating as a broker and trader in a foreign jurisdiction and who, at all times pertinent hereto, conducted business in the State of Florida.   BORKER DEALER DOES 1 through 40 are licensed by the National Association of Securities Dealers, Inc. and authorized to and did, in fact, trade the stock of Cybercare, Inc. Defendants KNIGHT SECURITIES LLP, SCHWAB CAPITAL MARKETS, SPEER, LEEDS AND KELLOG, M.H. MYERSON, AMERITRADE, MORGAN STANLEY,

3

GLOBAL SECURITIES (CANADA), E-TRADE, FIERO BROTHERS, TD-WATERHOUSE, JEFFRIES & CO, BEAR STEARNS, FLORIDA DISCOUNT BROKERS, PACIFIC SECURITIES (CANADA), FLEET TRADING, INSTINET CORPORATION, GRUNTAL & CO., ARCHIPELAGO LLC, ING BARINGS FURMAN SELZ, DREYFUS, FIRST BERMUDA, DLJ, DATEK, SHERWOOD SECURITIES, are licensed by the National Association of Securities Dealers, Inc. and authorized to and did, in fact, trade the stock of Cybercare, Inc. Upon information and belief, all of these Defendants were engaged in the illegal naked shorting activities and activities involving the failure to deliver securities of CYBR, as alleged herein below.

15.     At all times relevant hereto, Defendant DEPOSITORY TRUST AND CLEARING CORPORATION ("DTCC") was a New York corporation.

16.     Defendant, DEPOSITORY TRUST COMPANY ("DTC"), is a limited purpose trust company formed under the laws of New York, and is a self-regulatory organization.  DTC is a wholly-owned subsidiary of DTCC.  Defendant NATIONAL SECURITIES CLEARING CORPORATION ("NSCC") is a foreign corporation and a wholly-owned subsidiary of DTCC. Defendant FIXED INCOME CLEARING CORPORATION ("FICC") is a foreign corporation and a wholly-owned subsidiary of DTCC.  DTCC, DTC, NSCC and FICC will be jointly referred to herein as "DTC".  At all times relevant hereto, DTC was doing business in Florida.

17.     DTCC'S board is made up of 21 directors, who also serve as directors of the DTCC'S operating subsidiaries, DTC, NSCC and FICC, as set forth above.  Seventeen directors represent DTC Participants, including international broker-dealers, correspondent and clearing banks, mutual fund companies and investment banks.  Two directors are designated by DTCC'S preferred shareholders: NASD and the New York Stock Exchange.  The remaining two directors are the chairman and chief operating officer of DTCC itself.

4

18.     Individuals are nominated for election as DTCC directors based on their ability to represent participants of each of DTCC'S operating subsidiaries, and Board committees are specifically structured to help achieve this objective.

19.     The DTCC directors, and one former director, named herein as Defendants and their securities industry affiliations, are: BRADLEY ABELOW, Managing Director, Goldman Sachs, (NYSE: GS); MICHAEL C. BODSON, Managing Director, Morgan Stanly (NYSE: MWD); JONATHAN E. BEYMAN, Chief Information Officer, Lehman Brothers (NYSE: LEH); FRANK J. BISIGNANO, Chief Administrative Officer and Senior Executive Vice President, Citigroup (NYSE: C), which is Solomon Smith Barney's Corporate Investment Bank; STEPHEN P. CASPER, Managing Director and Chief Operating Officer, Fischer Francis Trees & Watts, Inc.; JILL M. CONSIDINE, Chairman, President & Chief Executive Officer, The Depository Trust & Clearing Corporation (DTCC); PAUL F. COSTELLO, COO Wachovia Securities (NYSE: WB); JOHN W. CUMMINGS, Senior Vice President & Head of Global Technology & Services, Merrill Lynch & Co. (NYSE: MER); DONALD F. DONAHUE, Chief Operating Officer, The Depository Trust & Clearing Corporation (DTCC); MARY M. FENOGLIO, Executive Vice President, State Street Corporation (NYSE: STT); GEORGE HRABOVSHY, President, Alliance Global Investors Service; RONALD J. KESSLER, Vice Chairman, A.G. Edwards & Sons, Inc. (NYSE: AGE); CATHERINE KINNEY, President, Co-Chief Operating Officer and Executive Vice Chairman, new York Stock Exchange; PETER B. MADOFF, Senior Managing Director, Bernard L. Madoff Investment Securities; EILEEN K. MURRAY, managing Director and Global Head of Technology and Operations, Credit Suisse (NYSE: CSR) First Boston; JAMES P. PALERMO, Vice Chairman, Mellon Financial Corporation (NYSE: MEL); THOMAS J. PERNA, Senior Executive Vice President, Financial Companies Services Sector of The Bank if New York (NYSE: BK); RONALD PURPORA,

Chief Executive Officer, Garban LLC; DOUGLAS SHULMAN, President, Regulatory Services and Operations, NASD; ROBERT H. SILVER, Executive Vice President and President of Paine Webber Services, UBS (NYSE: UBS); Paine Webber Inc.; DENNIS J. DIRKS, former Director and Chief Operating Officer, DTCC, now retired; and THOMPSON M. SWAYNE, clearing agents, all dealing in the CBYR stock.  These Defendants will be referred to herein as "DTC Director Defendants".

## SPECIFIC ALLEGATIONS

20.     CAPECE was the owner of 100% of the stock in Air Response Air Ambulance, Inc. ("Air Response"), a New York Corporation, incorporated in 1986.  Air Response began as a ground and air ambulance transport company which served three counties in upper state New York.  From 1986 to 1999 the business expanded, operating in Colorado, Florida, Kentucky and New York with a fleet of twelve aircraft and approximately 35 ground vehicles.  In 1999 Air Reserve had gross revenues of $25,000,000.00.

21.     On or about April 8, 1999, CAPECE sold Air Reserve to Cybercare, Inc., a Florida Corporation, with its principal place of business in Boynton Beach, Florida.  By the terms of the sale, CAPECE exchanged his shares of stock in Air Response, valued at $5,000,0000.00, for 3,100,000 shares of stock in Cybercare, Inc.  As a result of the equity that Air Response had in its aircrafts, the exchange for shares of Air Response stock increased the net asset value of the Cybercare, Inc. Immediately after the share exchange, and a a direct and proximate result thereof, the market price for Cybercare, Inc. shares on the OTC Bulletin Board substantially rose in value. On April 8, 2000, the per share price in the open market reached approximately   $15.80,   making   CAPECE'S   share   ownership   value   approximately $49,000,000.00.

22.     Cybercare, Inc., a health management company, developed the electronic house call system commonly patent internet base technology system that provides remote monitoring of individuals for healthcare purposes.     Additionally, Cybercare, Inc. operates physical, occupational and speech therapy centers, an e-pharmacy and one of the world's largest ambulance transport services.  At the time of the transaction Cybercare, Inc. had 39.1 million shares outstanding and had an average daily volume of 1,386,487 shares.

23.     The shares of Cybercare, Inc. stock of received by CAPECE were shares of stock which was restricted from being sold for one year, pursuant to Rule 144 of the Securities Act of 1933, as amended. CAPECE did not actually receive the stock certificate from Cybercare, Inc., until on or about September 7, 1999.

24.     At the time of the sale of Air Response to Cybercare, Inc., the publicly trading price of the Cybercare, Inc. stock was $15.00 per share.  However, CAPECE was prohibited from selling his shares because of the Rule 144 restrictions.

25.     On April 14, 2000, Cybercare, Inc. was approved for listing on the NASDAQ. Thereafter the Cybercare, Inc. stock began publicly trading on the NASDAQ national market as CYBR.  In calendar year 2000, Cybercare, Inc. obtained $31,000,000.00 in equity financing.  In return, it issued 500,000 common shares for $22.00 a share, along with a warrant to buy 100,000 shares at an exercise price of $31.00 a share.  At that time, a single investor bought the shares and the warrant.  On that date, two institutional investors bought shares that provided enough cash to start the market for the aforesaid electronic house call system, and the price of CYBR shares was $7.78 per share.

26.     The price of the Cybercare, Inc., stock continued to decline steadily from approximately $15.80 per share on April 8 2000, to approximately $.02 per share on April 8, 2004.

27.     CAPECE resigned from the Board of Cybercare, Inc. and was able to sell some of his shares. CAPECE sold approximately 2,400,000 shares and still holds 700,000 shares.  The total amount of money he received was $600,000 instead of the $ 49 million which was the true value of his share ownership.

28.     Each of the Defendants listed in paragraphs 7-18 has established, maintained, facilitated, and/or participated, directly or indirectly, in activities establishing and/or holding "naked short" positions in the CBYR stock and/or allowing each of the other Defendants to establish and/or hold "naked short" positions in the CBYR stock and/or fail to deliver securities of CYBR after a "naked short" transaction.  Stock transfer records of CBYR, together with the electronic records of Defendants, and especially DTC, establish the nature and extent of the "naked short" positions established and held by each of the Defendants, and the prices at which they which sold short, as well as their respective failures to deliver shares of CYBR, as required by law..

29.     Based on CBYR'S stock transfer records, together with the electronic records of Defendants, and especially DTC, and other market transaction records and information, the respective CBYR stock positions of Defendants, and their failures to deliver securities, as represented and/or omitted to disclose  to Plaintiff and the financial community and shareholders of CBYR, constituted materially false and misleading information concerning the actual market and market transactions for the publicly traded securities of CBYR, in that Defendants, and other firms similarly situated (which changes from time to time), purport to own or control more free trading shares than are available in the market and/or failed to deliver securities, as required by law.  And, upon information and belief, these figures involving "naked shorts" and failures to deliver securities are increasing dramatically week by week.

30.     Defendants set forth in Paragraphs 11-13, as NASD licensees, owe a duty of care to Plaintiff to employ reasonable means and practices to ensure that trade transactions conducted on their own or on behalf of third parties are not being conducted for the purpose of, or which it is reasonable to foresee may or will have the result of improperly, deceptively or fraudulently (a) manipulating the market price of publicly traded CBYR shares, or (b) presenting false or misleading information concerning the price, actual trading activity and/or number of free-trading shares of CBYR outstanding and/or trading and/or failures to deliver securities. Pursuant to that duty, Defendants, and each of them, have to take reasonable steps to ensure that, when conducting "short sales", and that the securities which are subject of the particular trade can be delivered or borrowed by the settlement date and/or a specified date thereafter. In fact, Defendants, specifically including the DTC, which established, maintained and controlled the shares of stock, electronic records and trading of CYBR securities, including failed deliveries of CYBR securities, have all been involved in failed deliveries of securities, and have facilitated each of the other Defendants in its respective failure to deliver securities, all to the damage of Plaintiff.

31.     Defendants, and each of them, represented, and continue to represent to the public and Plaintiff, that the trades they conduct on their own or on behalf of third parties are *bona fide* transactions (a) which have been reasonably reviewed by them to ensure that the trading activity is not being conducted to improperly manipulate stock prices and/or (b) which present information to the investing public, financial community or Plaintiff accurately and truthfully portraying the status of stock transactions, ownership or control, and/or (c) accurately and truthfully portraying the amount of CBYR stock actually in the marketplace or owned by or under the control of Defendants, and/or are securities which have been delivered, as required by law.

32.     Defendants knew, or should have known that they did not own or control the securities represented to have been owned or controlled by them. respectively, and had no basis or reasonable belief that (a) they owned or controlled such securities, or (b) they had or could locate a source of CBYR shares to cover their "short" positions, or (c) the securities they each respectively sold short could or ever would be delivered.  The information Defendants provided to Plaintiff and others was materially false and misleading because Defendants were "short" the securities, did not own or control such securities. and had no reasonable, legal or legitimate source of shares to cover such "short" positions, and totally failed to ever deliver the subject securities.  Moreover, Defendants each knew, or should have known that they were individually unable to ever make delivery of the subject securities, as they neither owned the securities nor had a source from which to legitimately borrow such securities. Defendants are engaged in unlawful "shorting", also known in the market as "naked short sales", and/or "failure to deliver".

33.     Defendants, and each of them, represented that "short sale" transactions have been and will be settled by delivery or borrowing of securities by the settlement date or specified date thereafter.  Defendants knew, or should have known, that these representations, though false and misleading, would be relied upon by Plaintiff and others.

34.     Representations made by Defendants in paragraphs 27-32, above were made intentionally and/or negligently, and were materially false and misleading, in that:

(a)     Defendants did not deliver or borrow securities by the applicable settlement date or specified period thereafter in order to legally complete the "short sales" which they conducted in regard to securities of CBYR.

(b)     Defendants' "short" sales are "naked", in that Defendants do not and did not own or control, nor have they, nor can they borrow sufficient shares of CBYR stock to cover

the "short" positions they hold, as required by law, thus resulting in a failure to deliver the securities, as required by law.

(c)     Defendants have created false and misleading information in the financial marketplace as regards the total outstanding shares of CBYR that are free-trading and the total number of CBYR shares that trade in *bona fide* market transactions from day to day.

(d)     Defendants were "short" the securities, did not own or control such securities, and had no reasonable, legal or legitimate source of shares to cover such "short" positions, and knew they could never actually deliver the securities, as required by law.

(e)     The trades Defendants conducted or participated in on their own or on behalf of third parties were not *bona fide* transactions which had been reasonably reviewed by them to ensure that the trading activity was not being conducted to improperly manipulate stock prices and/or mislead the financial community, and especially, Plaintiff.

(f).     The trades Defendants conducted or participated in or on their own or on behalf of third parties were not *bona fide* transactions which presented true and accurate information to the investing public, or Plaintiff.

(g)     Defendants did not accurately and truthfully portray the status of stock transactions, ownership or control, the amount of CBYR stock actually in the marketplace or owned by or under the control of Defendants.

(h)     Defendants failed to disclose to the investing public, or to Plaintiff, the numbers of shares which were subject of failures to deliver securities as and when required by law.

35.     Defendants acted with *scienter*, in that they knew their actions and conduct was wrong and illegal, but they had a very obvious motive for their conduct, which was the profits they made from their "naked shorting" and "failure to deliver" activities, specifically including

the DTC, which made massive profits (upon information and belief, approximately US$220 MILLION in 2003) from their lending of CYBR shares to the other Defendants, and related services, without regard for the number of CYBR shares DTC had on deposit or was able to legally lend to the other Defendants.

36.     During years 2001, 2002, and continuing into 2003 and 2004, Defendants repeatedly conducted, and continue to conduct, "short sales" of CBYR stock without taking any measures to ensure that the stock could be delivered or borrowed by the settlement date and/or any other specified date (the "Naked Short Sales"). The "Naked Short Sales" destroyed the integrity of the trading market for CBYR stock because it allowed more shares to trade than were ever issued in the history of CBYR. The "excess" shares allow new purchasers, including Plaintiff, to enter the market, but the sellers of the shares, namely Defendants, do not deliver the shares they sold to such purchasers.

37.     The result is that Defendants create an artificial and false trading system, and information relating thereto, that allows an unlimited number of shares to be sold by Defendants, thus (a) artificially diluting shareholder interests, including the interests of Plaintiff, (b) devaluing the shares of Plaintiff in the marketplace and (c) manipulating market share prices. Defendants have created a totally fraudulent and misleading trading market in CBYR stock.

38.     Defendants failed and refused to take and reasonable measures of care with regard to their trading, clearing and/or transfer of shares of CBYR and breached their respective duties of care by, *inter alia:*

(a).     failing and refusing to implement reasonable and proper procedures and policies to prevent "Naked Short Sales",

(b).    failing and refusing to reasonably and properly monitor and supervise its employees and/or agents to ensure compliance with lawful prohibitions against "Naked Short Sales",

(c).    failing and refusing to implement and/or enforce and/or maintain reasonable and proper internal policies and procedures to monitor, detect and prohibit "Naked Short Sales",

(d).    failing and refusing to implement and/or enforce and/or maintain reasonable and proper accounting policies and procedures to monitor, detect and prohibit "Naked Short Sales",

(e).    failing and refusing to take any reasonable and proper action to monitor, detect and prohibit "Naked Short Sales", when they knew, or should have known, that "Naked Short Sales" were occurring and there was a trading pattern that involved innumerable failed deliveries of securities.

39.    Defendants, and each of them listed in Paragraphs 11-18, caused the publicly-traded float of the CBYR stock to be artificially inflated, thereby manipulating and/or controlling the price of CBYR stock in the public market.

40.    During year 2002, and continuing into 2003 and 2004, Defendants acted in concert with each other, and DOES 1-20, which are other securities industry professionals yet to be identified, to wrongfully engage in the activities described above, including the manipulation of the market price and perceived public float of the publicly-traded shares of CYBR.

41.    It has been recently discovered by the Plaintiff that Cybercare, Inc., stock has been manipulated through widespread patterns of violation of NASDAQ rules 3370 (prompt receipt and delivery of securities), thus violating the rules governing the time for settlement of short sales.

42.    Shares of Cybercare, Inc. are not on the "easy to borrow list" and, therefore, in the case of short sales by brokers and handling by broker dealers who are required to establish and

certify reliable source of share certificates as a condition precedent to executing the sale, Plaintiff alleges that rule 3370 has been violated by numerous Defendants in regard to the settlement of a short sale.  The shares were not delivered within the three (3) days from the date of the transactions, as required by the rules, and therefore, the price of the Cybercare, Inc. stock and the value of Plaintiff's shares in Cybercare, Inc., were greatly diminished.  It is alleged that the broker dealers executed a short sale on behalf of a customer and did not deliver the share certificates timely.  The original owner of the shares that were certified as a supplier of the certificates was also a customer who held Cybercare, Inc. shares in the street account on margin, and DTC would have had to mark their shares as canceled, yet the customer's account with the firm would indicate that it was still the owner of the share; therefore, the broker-dealer would improperly include in the tally and report to ADP the number of shares their records reflected still being in the respective customer's account.  When ADP delivered its results of all the shares claimed to be owned, it would be counting the shares that were reported for the lending customer, that is, the "original, owner and putative lender of the certificates", as well as shares of the buyer for the short-selling/borrowing customer.  Each would be claiming, through ADP records, to be the record holder of the same shares.  These actions would artificially depress the trading price of CYBR on NASDAQ, thus artificially and illegally manipulating the flow of the shares in the marketplace.

43.     ELGINDY, is a California businessman who had extensive experience as a stock trader and offered and distributed advice to third parties, including Defendants identified in paragraphs 8-13 above, regarding the "naked short" sales of CYBR shares.

44.     ELGINDY, at all material times, owned the ELGINDY SITES.  These were private internet web sites whose members paid approximately $300-$1,500 to be members of the sites, and worked in concert to short the stock selected by ELGINDY, JOHN DOES 1 through

40, and the ELGINDY ACCOMPLICES (these parties are collectively referred to as the "Conspirators"). The sole purpose of the sites was to use the collective financial wealth of the Conspirators to manipulate the prices of the publicly traded shares of public companies by continually selling shares into the market to produce a downward pressure on the price of the said shares, specifically including CYBR.

45.    The Conspirators did not own and could not deliver the shares they sold. Instead, they sold stock they did not own, in a concerted effort, including through the internet chat-rooms and ELGINDY SITES, to force the price of the stock downward, and then profit by buying the stock back at a lower price, thus "covering" their short sale and generating massive profits for themselves.

46.    To help force stock prices downward, the Conspirators would also attempt to cause the legitimate shareholders to sell stock at reduced prices by spreading false and misleading information and rumors of the downfall of the targeted company, including Cybercare, Inc. Because the targeted companies had only limited resources and a limited public market for their respective shares, the flooding of the market with sale orders, including sale orders from Defendants identified in paragraphs 1-13, and bad news led to the downward spiral in the price of the shares of the targeted public company, including shares of CYBR. The spread between the sale price at which the Conspirators sold the stock short, and the price at which the stock was later purchased to cover the short sales, was their profit.

47.    The Defendants ELGINDY and the ELGINDY ACCOMPLICES entered into a scheme to drive down the price of CYBR stock. These Defendants obtained information from FBI agents that was stored on electronic media for investigative purposes, and which would not have otherwise been available to the general public, and disseminated the same over the internet and via telephone, all in interstate commerce. This information was intended to and did, in fact,

adversely affects the price of the shares of the targeted companies, and was given to certain FBI agents who then commenced investigations based on this information. Cybercare, Inc. was one of the companies targeted and became the victim of this course of action by these Defendants. The combination of the adverse information and the investigation of Cybercare, Inc. by the FBI resulted in Defendants being successful in driving down the price of CYBR stock in the public market.

48.     The BROKERS and BROKER DEALER Defendants participated in and contributed to the aforementioned activities by selling shares they did not own on their own account and by encouraging and advising, and aggressively facilitating the sales made by the Conspirators.

49.     The Defendants, acting in concert, inflated the apparent number of shares in the marketplace through naked short selling of stock. The Defendants used this falsely inflated and misleading number of shares and related illegal share transactions to manipulate the price of the stock. The Defendants continuously sold CYBR stock they did not own, and could not deliver, as required by law, thus creating a glut in the marketplace, and thus causing the price of the CYBR shares to drop, including those owned by Plaintiff.

50.     The CYBR stock, from the time CAPECE could have sold his shares and until present date, has been selling in the range of $.30 to$.60 per share. Cybercare, Inc., as an operating business entity, was totally destroyed as a result of the naked short selling and other illegal activities by the Defendants.

## CIVIL RICO VIOLATIONS

51.     Plaintiff incorporates herein by reference the factual statements contained in Paragraphs 1 through 51 above.

52.    As set forth above, Defendants, and each of them, acted as an enterprise engaged in and whose activities were fraudulent and otherwise illegal, and affected interstate commerce, all unrelated to securities fraud.  During the course of the underlying transactions, Defendants, in furtherance of their enterprise, devised and intended to devise a scheme and artifice to defraud and mislead and public through the illegal manipulation of the share price of Cybercare, Inc., by utilizing illegally obtained information from FBI agents, by publicly disclosing misleading information, by illegally flooding the market with "sell" orders when there was no compliance with short-selling regulations or shares available to deliver in connection with the sale transactions, by planning and acting in concert to coerce the financial community, including Plaintiff, into acting in a manner that furthered Defendants' greedy and illegal purposes and schemes.  The sole purpose of the enterprise was to create profit for the Defendants through their unlawful enterprise.  At all times, the Defendants, and each of them, knew their activities were illegal.  Throughout the above stated time period, and as more specifically described above, Defendants acting in concert with one another in their enterprise, and in conducting the affairs of the enterprise, for purpose of executing the aforesaid scheme and artifice, and, attempting to do so, utilized interstate commerce, the internet, and interstate phone service.

53.    In conducting their enterprise, the Conspirators and ELGINDY ACCOMPLICES directly violated 18 U.S.C. 121 (1) in that they utilized information and accessed information that was stored in electronic media for the use of FBI agents on government business, and disseminated the same via interstate internet and telephonic services solely for the purpose of furthering their joint illegal scheme.  The remaining Defendants knew or should have known of these activities, but chose to take no investigative or other action, but instead, continued their profit-making enterprise.

54.     As a result of and by reason of the above described racketeering activity, through which the said enterprise's and association-in-fact's affairs were conducted in violation of 18 U.S.C. § 1962, Plaintiff has been damaged and is entitled to recover from the Defendants, jointly and severally, all damages proximately resulting from Defendants' wrongful conduct.  Moreover, by virtue of Defendants' acts as set forth above, Plaintiff is entitled to recover triple their damages, in addition to their attorney's fees, together with their costs of this action, all  pursuant to 18 U.S.C. § 1964 (c).

**NEGLIGENCE**

55.     Plaintiff incorporates herein by reference the factual statements contained in Paragraphs 1 through 55 above.

56.     The DTC, BROKERS and BROKERAGES were negligent in processing the illegal short sales of the Conspirators in violation of the rules for processing and clearing short trades, as well as the rules relating to delivery of securities.

57.     These Defendants knew or should have known that the processing of such trades, and failure to deliver securities, would negatively affect the market price of the said shares and, thereby, damage the Plaintiff as a direct and proximate result. Such conduct also interfered with contractual relationships and prospective economic advantages available to Cybercare, Inc., causing the share price of CYBR to go down dramatically.

58.     The damage suffered by the Plaintiff was a direct result of the negligence of the Defendants, and the Plaintiff seeks to recover all damages as a result of the said negligence.

**UNJUST ENRICHMENT AND ACCOUNTING**

59.     Plaintiff incorporates herein by reference the factual statements set forth in Paragraphs 1 through 59 above.

60.     The Defendants purported to borrow and, electronically, were illegally allowed to borrow, without ever delivering or repaying/returning the borrowed shares, and/or borrowed, and/or allowed to be borrowed, shares from the public to further their enterprise, all as more fully set out above.

61.     The Defendants further took part in, or allowed, the illegal short selling and failure to deliver of Cybercare, Inc. stock.

62.     As a direct result, the Plaintiff was damaged, and the Defendants made profit at the expense of the Plaintiff.

63.     The Plaintiff demands an accounting by the Defendants respecting the transactions engaged in with CYBR shares and the profits made through their enterprise, including the transactions engaged in at the expense of Plaintiff.

64.     The Plaintiff demands that such amount as was profit to the Defendants be paid over to Plaintiff, as the Defendants have been unjustifiably enriched at the expense of Plaintiff.

65.     Plaintiff has no adequate remedy at law.

## FRAUD

66.     Plaintiff incorporates herein by reference the factual statements contained in Paragraphs 1 through 66 above.

67.     Defendants, including the Conspirators, did knowingly defraud the Plaintiffs by manipulating the market price of the shares of NASDAQ, as abovementioned.

68.     As a direct and proximate result of said Defendants' actions, Plaintiff has been severely damaged, and seeks to recover such damages.   Also, because the said Defendants' actions were wanton, reckless conduct, designed to create profit by directly and knowingly injuring Plaintiff, and because such is morally reprehensible, and offends public policy, Plaintiff also seeks to recover punitive and exemplary damages.

## DECEPTIVE TRADE PRACTICES

69.     Plaintiffs incorporate herein by reference the factual statements set out in Paragraphs 1 through 69 above.

70.     Defendants have committed one or more violations of the Florida Deceptive Trade Practices – Consumer Protection Act.  Plaintiff is a consumer, as defined in the said Act

71.     The conduct of one or more of the Defendants constitutes a deceptive trade practice, as defined by the Act.

72.     Plaintiff seeks damages and such other relief as is permissible pursuant to the said Act.

## CONSPIRACY

73.     Plaintiff incorporates herein by reference the factual statements set out in Paragraphs 1 through 73 above.

74.     Pleading further, by the acts and omissions alleged throughout this Complaint, the Defendants herein conspired one with the other, for the common purpose of accomplishing an unlawful purpose or to accomplish a lawful purpose by unlawful means.   The Defendants knowingly and purposely committed one or more overt acts in furtherance of the conspiracy as set forth above.  As a result of such conspiracy, Plaintiff has been damaged and is entitled to recover from the Defendants, jointly and severally, all damages proximately resulting from Defendants' wrongful conduct.

75.     The Defendants acted with tortuous disregard of the Plaintiff's rights.  Further, Defendants acted in a wanton and malicious manner for the purpose of causing harm to Plaintiff. Such conduct entitles Plaintiff to punitive and exemplary damages to act as a deterrence to prevent similar behavior in the future, as well as damages for the losses suffered by Plaintiff.

## INJUNCTION AND DECLARATORY RELIEF

76.     Plaintiff incorporates herein by reference the factual statements set out in Paragraphs 1 through 76 above.

77.     This is an action within this Court's equitable jurisdiction.

78.     Plaintiff will suffer immediate and irreparable harm to his business reputation and loss of its good will, unless the status quo is maintained.  Should the Defendants be allowed to continue their short selling activities, Plaintiff will be irretrievably damaged.

79.     There is a reasonable likelihood of success on the merits of the Plaintiff's claims.

80.     Plaintiff has no adequate remedy at law and there is no plain, speedy and adequate remedy of law.

81.     Plaintiff has a clear legal right to the relief requested.

82.     The balance of equities favors the entry of a Temporary Restraining Order and Preliminary Injunction.

83.     The issuance of a Temporary Restraining Order and Preliminary Injunction will serve the public interest.

84.     Plaintiff seeks injunctive relief against the Defendants to have them cease and desist from their short selling activities, and failures to deliver.

85.     Plaintiff further seeks a declaratory judgment of this Court, ordering Defendants to buy-in with respect to any current short positions, and present proof that they no longer have any short positions with respect to the shares of Cybercare, Inc.

## RELIEF DEMANDED

1.     For general damages in excess of $50,000,000.00 from each Defendant in favor of each Plaintiff;

2.     For special damages as proven at the time of trial;

3.     For punitive damages in excess of $50,000,000.00 from each Defendant in favor of each Plaintiff;

4.     For reasonable attorney fees;

5.     For treble damages and attorneys' fees under the RICO statutes;

6.     For an accounting from each Defendant of all transactions involving CYBR securities from January 1, 2000, through date of accounting, specifically including the electronic records of DTC regarding the lending of CYBR shares to DTC Participants (including the sub-C and sub-D accounts at the NSCC for each Participant) and monies derived by DTC there from;

7.     For a temporary and permanent injunction;

8.     For a declaratory judgment;

9.     For costs of suit and statutory interest; and

10.    For any such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues.

DATED this _____ day of April, 2004

LAW OFFICES OF ROBERT C. STONE, P.A.
555 South Federal Highway
Suite 450
Boca Raton, Florida 33432
Telephone: (561) 338-4844
Facsimile: (561) 338-4807

By: _____
     ROBERT C. STONE, ESQUIRE
     Florida Bar No.: 106117

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

LOUIS R. CAPECE, JR.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   MONROE
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Robert C. Stone, Esquire
555 South Federal Highway, Suite 450
Boca Raton, Florida 33432 (561)338-4844

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:  DADE,  MONROE,  BROWARD,  PALM BEACH,  MARTIN,  ST. LUCIE,  INDIAN RIVER,  OKEECHOBEE,  HIGHLANDS

## DEFENDANTS

ANTHONY ELGINDY et al.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   OUT OF STATE
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

ATTORNEYS (IF KNOWN)

04—80403

KLR/AEV

CIV-RYSKAMP
MAGISTRATE JUDGE
VITUNAC

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med Malpractice | B☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | B☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☒ 810 Selective Service |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | B☐ 690 Other | **B SOCIAL SECURITY** | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **A LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| B☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | B☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | B☐ 535 Death Penalty | | ☐ 871 IRS – Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | A☐ 791 Empl. Ret. Inc. Security Act | | ☐ 890 Other Statutory Actions A OR B |
| ☐ 290 All Other Real Property | | B☐ 550 Civil Rights | | | |
| | | B☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION
(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

LENGTH OF TRIAL
via ___ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $ 49,000,000   CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES ☐ NO

## VIII. RELATED CASE(S) (See instructions):
IF ANY

JUDGE _____   DOCKET NUMBER _____

DATE  4/27/04

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT $119.00 _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____